MURPHY, Circuit Judge.
Minnesota homeowners brought this action[1] against Zurn Pex, Inc. and Zurn Industries, Inc. (Zurn) alleging that brass fittings used in the company’s cross linked polyethylene (PEX) plumbing systems are inherently defective. In pretrial motions the homeowners' sought class certification for their consumer protection, warranty, and negligence claims, and Zurn moved to strike the testimony of two of the homeowners’ experts. After denying Zurn’s motion to strike the expert testimony, the district court[2] granted the homeowner requests for class certification for their warranty and negligence claims, but denied it for their consumer protection claims. Zurn appeals from the district court’s certification order. We affirm.
I.
Zurn manufactures and markets a home plumbing system that uses PEX tubing, an alternative to traditional copper water pipes. PEX tubing systems are marketed as easier to install, cheaper, and longer lasting than copper plumbing systems. The Zurn PEX systems have been installed in homes throughout the United States. Zurn has sold its PEX systems with a 25 year limited warranty.
In the plumbing systems at issue in this case, PEX tubes are joined together using *609 a brass fitting and crimp. A tube is placed around a fitting, the crimp is tightened around the outside of the tube, and the resulting pressure creates a seal between the tube and the fitting. The homeowners allege that the brass fittings used in these systems are “doomed to leak within warranty” because of their susceptibility to stress corrosion cracking (SCC) which results from a combination of pressure and corrosion. The homeowners argue that SCC inevitably begins to affect Zurn’s brass fittings upon their installation and exposure to water. The SCC increases over time and the fitting eventually begins to leak, causing costly water damage to homes. Zurn argues that SCC is not an inherent defect and that it is instead caused by a variety of factors which include improper installation and overly corrosive water. Some of the homeowner plumbing systems have leaked, but others have not.
The parties disagreed about pretrial discovery. The homeowners sought a single phase discovery plan, but Zurn suggested bifurcated discovery. The district court adopted Zurn’s approach and ordered that the first phase of discovery address the limited question of class certification. At the close of the first phase of discovery, the homeowners moved for class certification. Zurn opposed it and moved to strike testimony from two of the homeowners’ experts, Dr. Roger W. Staehle and Dr. Wallace R. Blischke.
Dr. Staehle is the former Dean of the University of Minnesota Institute of Technology. He has been researching and publishing articles on SCC for over 40 years. Dr. Staehle examined Zurn brass fittings, including some which had leaked as well as some which were new. He conducted a battery of tests on the fittings. His tests included scanning electron microscopy, electron dispersive spectroscopy, auger electron dispersive spectroscopy, microhardness testing, materials analysis, water chemistry analysis, and static load testing. He also performed a “U-bend” experiment where metal samples from the fittings were bent into a U shape and then tested to determine their susceptibility to SCC. Dr. Staehle subjected these samples to strain, immersed them in different water solutions, and then checked them after two, four, and six months. He concluded that his experiments showed that “rapid SCC would occur” in Zurn’s brass fittings.
Based on his knowledge about SCC and his numerous tests, Dr. Staehle concluded that “[t]he failure process in Zurn fittings starts as soon as they are exposed to domestic water,” “[significant numbers of leak-causing failures appear to occur in as little as a single year,” and “[tjhere is no evidence ... that the Zurn fittings can perform reliably for 25 years ... nor are there any bases for a much longer design life of about 40 years.” Dr. Staehle attributed the poor performance of the fittings to choice of materials and to poor manufacturing. He rejected the theory that the SCC in Zurn’s fittings was caused by unusually corrosive water or improper installations.
Dr. Blischke is a statistician and Professor Emeritus at the University of Southern California. He has written a number of books on product reliability and warranties. Dr. Blischke undertook a study of Zurn PEX plumbing systems and analyzed the failure rate of those systems with Zurn’s brass fittings. He grounded his analysis on the available warranty data obtained from Zurn. Since he found that data incomplete, he was required to make assumptions about the “mean time to failure” experienced by the brass fittings.
Based on witness testimony and documents indicating that Zurn considered 40 years to be the average lifetime of its PEX *610 systems, Dr. Blischke assumed a mean time to failure of 40 years. Using that figure and assuming that the average household installation contained 50 brass fittings, he calculated that 99% of homes would experience a leak in at least one of the fittings within 25 years. Dr. Blischke also conducted the same analysis based on alternate mean time to failure figures of 50, 60, and 100 years. The system failure rates remained high even when the longer mean time to failure figures were projected.
The parties disagreed about the appropriate application of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), at the class certification stage. The homeowners urged that expert testimony should only be excluded at this stage if it were “so flawed it cannot provide any information as to whether the requisites of class certification have been met.” Zurn argued, however, that the district court should conduct a full and conclusive Daubert inquiry before certifying a class.
The district court charted a middle course between the positions urged by the parties. After reviewing the evidence that had been produced, the court concluded that a full and conclusive Daubert inquiry would not be necessary or productive at this stage of the litigation, particularly since the expert opinions could change during continued discovery. The court instead conducted a focused Daubert inquiry to assess whether the opinions of Dr. Staehle and Dr. Blischke, based on their areas of expertise and the reliability of their analyses of the available evidence, should be considered in deciding the issues relating to class certification.
After conducting its focused Daubert inquiry, the district court denied Zurn’s motions to strike the testimony of the experts. The court made clear, however, that its rulings were not final and that its view of the issues might change as discovery continued and additional evidence was produced.
The district court then turned to the question of class certification under Fed. R.Civ.P. 23. The homeowner claims fell into three broad categories: consumer protection, breach of warranty, and negligence. For each claim, the homeowners moved to certify the following class:
All persons and entities that own a structure located within the State of Minnesota that contains a Zurn Pex plumbing system with Zurn[3] brass crimp fittings. The proposed class includes, without limitation, all such persons or entities who contacted Zurn or its representatives about their Zurn Pex plumbing system and were denied or partially denied warranty coverage for failure of the Zurn Pex plumbing system based on a claim that “corrosion” was not covered by the warranty or that other alleged warranty limitations applied.
This definition was used by the district court to analyze the Rule 23 class certification requirements with respect to the three categories of homeowner claims. It focused on what it termed the “core dispute between the parties” which arose out of Rule 23(b)(3)’s requirement that questions of law or fact common to the class predominate over individual questions. The court first determined that the issue of individual reliance in respect to the consumer protection claims was not amenable to class wide resolution. It refused to *611 certify a class for those claims, and no one has appealed that decision. The court next addressed the warranty claims, determined that common questions predominate as to them, and certified a class of warranty claimants. Finally, the court certified a limited class for the negligence claims. It limited the scope of that class to those members who had already “suffered damage to their property,” that is those who already had suffered an injury recognized in tort.
Zurn brings this Rule 28(f) interlocutory appeal of the order issued by the district court certifying the warranty and negligence classes. Zurn argues that the district court should have excluded the expert opinions of Dr. Staehle and Dr. Blischke and that it erred in declining to conduct what it calls a full and conclusive Daubert inquiry before certification. Zurn further contends that the district court applied the wrong standard and abused its discretion in certifying the warranty and negligence classes and erred by including persons in the warranty class whose plumbing systems had not yet leaked.
II.
Rule 23(c)(1)(A) provides that a district court should address class certification at an “early practicable time after a person sues or is sued as a class representative.” When deciding whether common issues predominate over individual issues under Rule 23(b)(3), the court should conduct a “rigorous analysis” including an “examination of what the parties would be required to prove at trial.” Avritt v. Reliastar Life Ins. Co., 615 F.3d 1023, 1029 (8th Cir.2010). Expert disputes “concerning the factual setting of the case” should be resolved at the class certification stage only to the extent “necessary to determine the nature of the evidence that would be sufficient, if the plaintiffs general allegations were true, to make out a prima facie case for the class.” Blades v. Monsanto Co., 400 F.3d 562, 567 (8th Cir.2005). We have never required a district court to decide conclusively at the class certification stage what evidence will ultimately be admissible at trial.
Here, both sides agree that the relevant expert testimony must be evaluated and weighed by the court before it decides to certify a class. Zurn urges that we adopt a new rule, requiring a district court to determine conclusively at an early stage, not just whether or not expert evidence is sufficient to support class certification under Rule 23, but also whether that evidence will ultimately be admissible at trial. It urges us to follow the approach used by a Seventh Circuit panel in American Honda Motor Company, Inc. v. Allen, 600 F.3d 813, 816-17 (7th Cir.2010) (per curiam).
The plaintiffs in American Honda sought to certify a class of motorcycle owners based on an alleged design defect affecting their motorcycles. The plaintiffs relied on an expert who had created his own methodology and standards which he then tested on a single used motorcycle. These tests had been developed only “to assist with a lawsuit and [were] not conceived through the logical flow of independent research,” had a “sample size of one,” and “lack[ed] acceptance” by the scientific community. Id. at 816. The Seventh Circuit panel was thus dealing with a case with expert conclusions based on flawed methodology and a sample size of one when it stated its preference for an early full and conclusive Daubert review.[4]
*612 The record in the case before us is very-different from the one in American Honda. No party in this case has alleged that the expert testimony here is similarly flawed. Both sides agree that Dr. Staehle and Dr. Blischke are well qualified in their respective fields and that they used generally recognized and reliable methodologies. Zurn nonetheless contends that the district court should determine at the class certification stage, and before merits discovery has even commenced, whether or not the expert opinions will ultimately be admitted at trial.
Our own circuit precedent does not favor the approach urged by Zurn. In Blades, we approved a district court decision which explicitly rejected a request for a full Daubert inquiry at the class certification stage. 400 F.3d at 569. We affirmed, concluding that the district court’s “findings as to the experts’ disputes were properly limited to whether, if appellants’ basic allegations were true, common evidence could suffice, given the factual setting of the case, to show classwide injury.” Id. at 575. In declining to conduct what Zurn terms a full and conclusive Daubert inquiry, the district court in Blades properly focused on “determining] the nature of the evidence that would be sufficient, if the plaintiffs general allegations were true, to make out a prima facie case for the class.” Id. at 567.
In this case, the district court followed Blades by applying what it termed a “tailored” Daubert analysis. Rejecting both parties’ extreme positions, it examined the reliability of the expert opinions in light of the available evidence and the purpose for which they were offered.[5] We can hardly fault the trial court for following our precedent in Blades, and we see no reason to abandon the “cardinal rule ... that one panel is bound by the decision of a prior panel.” Owsley v. Luebbers, 281 F.3d 687, 690 (8th Cir.2002). Moreover, we are not convinced that the approach of American Honda would be the most workable in complex litigation or that it would serve case' management better than the one followed by the district court here.
The district court sought to examine the reliability of the expert testimony in light of the existing state of the evidence and with Rule 23’s requirements in mind. The record in this case illustrates why that approach was appropriate and why requiring an even more conclusive Daubert inquiry at the class certification stage would have been impractical. As the district court noted with respect to Dr. Blischke:
Dr. Blischke’s analysis was circumscribed by the availability of warranty claims data. However, as merits discovery unfolds and more information becomes available, Dr. Blischke’s 40 year estimate for the mean time to failure may or may not be admissible.
It was after all Zurn which sought bifurcated discovery which resulted in a limited record at the class certification stage, preventing. the kind of full and conclusive *613 Daubert inquiry Zurn later requested. While there is little doubt that bifurcated discovery may increase efficiency in a complex case such as this, it also means there may be gaps in the available evidence. Expert opinions may have to adapt as such gaps are filled by merits discovery, and the district court will be able to reexamine its evidentiary rulings. See Walzer v. St. Joseph State Hosp., 231 F.3d 1108, 1113 (8th Cir.2000) (“Evidentiary rulings made by a trial court during motions in limine are preliminary____”). A court’s rulings on class certification issues may also evolve. See Fed.R.Civ.P. 23(c)(1)(C) (“An order that grants or denies class certification may be altered or amended before final judgment.”).
Class certification “is inherently tentative,” Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 n. 11, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978), and may “require revisiting upon completion of full discovery,” Blades, 400 F.3d at 567. Zurn’s desire for an exhaustive and conclusive Daubert inquiry before the completion of merits discovery cannot be reconciled with the inherently preliminary nature of pretrial evidentiary and class certification rulings.
The main purpose of Daubert exclusion is to protect juries from being swayed by dubious scientific testimony. That interest is not implicated at the class certification stage where the judge is the decision maker. The district court’s “gatekeeping function” under Daubert ensures that expert evidence “submitted to the jury ” is sufficiently relevant and reliable, Bonner v. ISP Technologies, Inc., 259 F.3d 924, 929 (8th Cir.2001) (emphasis added), but “[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself,” United States v. Brown, 415 F.3d 1257, 1269 (11th Cir.2005). Similar reasons support less stringent application of Daubert in bench trials. See Charles Alan Wright, Victor James Gold, 29 Fed. Prac. & Proc. Evid. § 6266, n. 90.2 (2010), and cases cited. The “usual concerns of the [.Daubert ] rule — keeping unreliable expert testimony from the jury — are not present in such a setting.” Metavante Corp. v. Emigrant Sav. Bank, 619 F.3d 748, 760 (7th Cir.2010).
Zurn correctly points out that we require district courts to rely only on admissible evidence at the summary judgment stage, see Tuttle v. Lorillard Tobacco Co., 377 F.3d 917, 924 (8th Cir.2004), but the questions then are quite different than at the class certification stage. Because summary judgment ends litigation without a trial, the court must review the evidence in light of what would be admissible before either the court or jury. See Fed.R.Civ.P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
In contrast, a court’s inquiry on a motion for class certification is “tentative,” “preliminary,” and “limited.” Coopers & Lybrand, 437 U.S. at 469 n. 11, 98 S.Ct. 2454; Blades, 400 F.3d at 566. The court must determine only if “questions of law or fact common to class members predominate over any questions affecting only individual members [and if] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.” Fed.R.Civ.P. 23(b)(3). As class certification decisions are generally made before the close of merits discovery, the court’s analysis is necessarily prospective and subject to change, Blades, 400 F.3d at 567, and there is bound to be some evidentiary uncertainty. Because a decision to certify a class is far from a conclusive judgment on the merits of the case, it is “of necessity ... not accompanied by the traditional rules and procedure applicable to civil trials.” Eisen v. Carlisle & *614 Jacquelin, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).
We conclude that the district court did not err by conducting a focused Daubert analysis which scrutinized the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence. In doing so the district court conducted the requisite “rigorous analysis” of the parties’ claims to determine “whether the defendant’s liability to all plaintiffs may be established with common evidence.” Avritt, 615 F.3d at 1029.
III.
After concluding its tailored Daubert analysis, the district court denied Zurn’s motion to strike the opinions offered by Dr. Staehle and Dr. Blischke. On its appeal Zurn does not dispute either of the expert’s qualifications or methodology. Their reputations as eminent experts in their respective fields are not in question. Rather, Zurn argues that their opinions were not based on “sufficient facts or data” and should therefore have been stricken.
Having already concluded that the district court applied the correct legal standard in declining to strike the expert opinions, we will reverse those evidentiary rulings only upon a showing that it abused its discretion in a way which “affected a party’s substantial rights.” Weitz Co. v. MH Washington, 631 F.3d 510, 525 (8th Cir.2011). We also keep in mind that, “[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility.” Bonner, 259 F.3d at 929 (quoting Hose v. Chicago Nw. Transp. Co., 70 F.3d 968, 974 (8th Cir.1996)). Such testimony should be excluded only if it “is so fundamentally unsupported that it can offer no assistance to the jury.” Id. at 929-30.
According to Zurn, Dr. Staehle applied an unrealistic amount of strain in his “U-bend” testing which affected his overall conclusion that its brass fittings invariably would experience SCO. In the view of Zurn’s expert, Dr. Staehle’s decision to apply a 20% strain in testing brass specimens was unreasonable because the actual strain on properly installed brass fittings was lower. The homeowners respond that the 20% strain was reasonable in the context of Dr. Staehle’s experiments. Moreover, they argue that any disagreement over the appropriate strain level only affects the weight of the evidence, not its admissibility.
The issue here is similar to one addressed in Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1344 (11th Cir.2003). There, an expert used a reliable method (computational fluid dynamics), but the parties disputed whether the expert “put the wrong information” into a computer program that he used to compute his results. Id. at 1343-44. The circuit court determined that when parties dispute “the specific numbers” to be used in an otherwise reliable scientific analysis, the “alleged flaws ... are of a character that impugn the accuracy of [the expert’s] results, not the general scientific reliability of his methods.” Id. at 1345. The district court had therefore not abused its discretion by declining to exclude the expert’s evidence under Daubert. Id. at 1346. Objections to generally reliable scientific evidence go to its weight, not its admissibility. See id. at 1345-46, and cases cited.
The validity of one of Dr. Staehle’s inputs was also challenged by Zurn. The district court concluded that the question of the proper strain to be applied in the U-bend tests went to “the accuracy of Dr. Staehle’s results, [but] not the general scientific validity of his meth *615 ods.” As the Supreme Court pointed out in Daubert, when evaluating an expert’s opinion, “[t]he focus ... must be solely on principles and methodology, not on the conclusions that they generate.” 509 U.S. at 595, 113 S.Ct. 2786. A district court necessarily has “considerable discretion” in deciding whether to admit expert testimony where the factual basis is disputed. Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 401 F.3d 901, 916 (8th Cir.2005). We conclude that the district court did not abuse its discretion in declining to strike Dr. Staehle’s testimony.
Zurn’s main attack on Dr. Blischke’s testimony about system failure rates is that he assumed a mean time to failure figure rather than attempting to calculate that figure from available data. Dr. Blischke explained that it was necessary to assume a mean time to failure figure because he lacked reliable warranty data from Zurn. He pointed to Zurn’s inadequate record keeping and evidence that many of its customers had stopped reporting leaks after Zurn began to reject warranty claims. Zurn does not directly dispute Dr. Blischke’s position that it is generally acceptable to include a reasonable assumption in a statistical analysis when there is insufficient data to calculate a particular value.
Because Dr. Blischke’s assumed mean time to failure figure was not unsupported, the district court did not abuse its discretion in declining to exclude his opinion. Dr. Blischke testified that he adopted a 40 year mean time to failure figure after examining a report in which Zurn itself referred to 40 years as “a normal lifetime” for its fittings. He also stated that he relied on reports prepared by other expert witnesses in this case. For example, in Dr. Staehle’s expert opinion there was “no evidence ... that the Zurn fittings can perform reliably for 25 years ... nor are there any bases for a much longer design life of about 40 years.” Dr. Blischke also provided additional calculations based on longer mean time to failure figures, up to 100 years, and those figures still showed high failure rates within 25 years.
Zurn claims that there were other weaknesses in Dr. Blischke’s approach. It faults his assumptions that brass fittings would fail randomly and in different households and that an average household would have 50 fittings. The record shows that Dr. Blischke actually considered a range of variables in his analyses, just as he did when considering mean time to failure figures. He provided failure rates, for example, based on 40, 50, 60, and 100 fittings per household system. This approach was reasonable, for Dr. Blischke’s expertise is in statistics and reliability, not plumbing or metallurgy. His testimony can help a fact finder understand the implications of opinions offered by other experts such as Dr. Staehle. If a factfinder doubts Dr. Blischke’s assumptions, then the factfinder will discount his ultimate conclusions or rely on his alternate calculations which account for different values. Such possibilities do not diminish the validity of Dr. Blischke’s scientific methods. An expert’s opinions are not inadmissible simply because an underlying assumption may be contestable. Marvin Lumber, 401 F.3d at 916.
The district court indicated that it was aware of certain limitations in Dr. Blischke’s analysis and that it had given his evidence its “proper weight.” It also noted that as additional evidence is uncovered during discovery, “Dr. Blischke’s 40 year estimate for the mean time to failure may or may not be admissible.” There is nothing in the record at this stage to show that Dr. Blischke’s opinions are so “fundamentally unsupported” as to require exclusion. See Bonner, 259 F.3d at 929-30.
*616 We conclude that the district court did not err or abuse its discretion in denying Zurn’s motion to strike the homeowners’ expert testimony.
IV.
Zurn argues that some members of the warranty class lacked standing to bring their claims and that the district court therefore erred by certifying that class. We ordinarily afford the district court “broad discretion in determining whether to certify a class,” Arthur Young & Co. v. Reves, 937 F.2d 1310, 1323 (8th Cir.1991), recognizing “the essentially factual basis of the certification inquiry and ... the district court’s inherent power to manage and control pending litigation,” Gene & Gene LLC v. BioPay LLC, 541 F.3d 318, 325 (5th Cir.2008). While we reverse only for an abuse of that discretion, a district court “abuses its discretion if it commits an error of law.” Blades, 400 F.3d at 566.
A district court may not certify a class, however, “if it contains members who lack standing.” Avritt, 615 F.3d at 1034. If members “who lack the ability to bring a suit themselves” aré included in a class, the court lacks jurisdiction over their claims, see id., and we therefore review Zurn’s standing challenge de novo, see, e.g., Curtis Lumber Co., Inc. v. Louisiana Pac. Corp., 618 F.3d 762, 770 (8th Cir. 2010). To show standing, a plaintiff bears the burden of establishing “injury in fact ... that is fairly traceable to the challenged action of the defendant, and likely [to] be redressed by a favorable decision.” Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 591 (8th Cir.2009). In most cases “the question whether [a plaintiff] has a cognizable injury sufficient to confer standing is closely bound up with the question of whether and how the law will grant him relief.” Id.
In asserting a warranty claim, it “is not enough” for a plaintiff “to allege that a product line contains a defect or that a product is at risk for manifesting this defect; rather, the plaintiffs must allege that their product actually exhibited the alleged defect.” O’Neil v. Simplicity, Inc., 574 F.3d 501, 503 (8th Cir.2009). In O’Neil, for example, crib owners failed to state cognizable warranty claims because they had not alleged that their cribs actually exhibited a dangerous defect that might have harmed their children; a mere likelihood that a crib might develop a dangerous defect was not enough. Id. at 503-04.
Zurn argues that those plaintiffs whose plumbing systems have not leaked — a group most accurately referred to as the “dry plaintiffs”[6] — have no standing because they, like the crib owners in O’Neil, have not suffered a cognizable injury. The homeowners respond that the district court correctly determined that the dry plaintiffs have alleged a current harm because they allege that the Zurn brass fitting contained a defect upon installation in breach of Minnesota warranty law. See Minn.Stat. §§ 336.2-313 & 2-314.
Pointing to several words in the class certification order, Zurn argues that the district court did not follow our rule that a manifestation of a defect is required for a warranty claim. See O’Neil, 574 F.3d at 503. At one point the district court commented that the homeowners were “not required to allege and prove a manifestation of [a] defect.” It had however stated *617 in its previous sentence that the homeowners had to “prove that the brass fittings are defective” in order to recover in warranty. When the sentences are read together, it is clear that the court’s position was that to give rise to a warranty claim a fitting must contain a defect, but that it need not have already caused external damage. This position was consistent with O’Neil even if there was some lack of precision in the district court’s statement of the applicable standard. O’Neil never indicated that a child would have to be injured by a crib for a defect to be manifest.
The dry plaintiff claims are distinct from any brought by hypothetical “no injury plaintiffs,” because the dry plaintiffs had alleged that their brass fittings exhibited a defect. In contrast to the plaintiffs in O’Neil, the homeowners do not argue that the fittings merely “risk” developing SCC. They allege that SCC afflicts all of the fittings upon use, regardless of water conditions or installation practices. As they have put it, SCC “is already manifest in all systems.” They supported this contention with expert testimony. Dr. Staehle opined, for example, that SCC develops in “Zurn fittings ... as soon as they are exposed to domestic water.” Given this evidence, the district court did not err in determining that the dry plaintiffs were not “no injury” parties simply because their plumbing systems had not yet leaked.
We conclude that the district court did not err in concluding that the claims of the dry plaintiffs are cognizable under Minnesota warranty law and that they may seek damages if they succeed in proving their claim of a universal inherent defect in breach of warranty. See Minn.Stat. § 336.2-714; Peterson v. Bendix Home Sys., Inc., 318 N.W.2d 50, 53 (Minn.1982) (explaining damages available for breach of warranty under the Minnesota UCC). The dry plaintiffs therefore had standing to bring their claims, and the district court did not err in certifying a class which included them.
Zurn further contends that the district court abused its discretion in granting class certification to the dry plaintiff claims before interpreting the terms of the company’s limited warranty. It argues that its warranty bars a claim unless a fitting has already leaked. In support Zurn cites its own statement disclaiming implied warranties along with the following sentence: “Under this warranty, you only have a right to reimbursement if the alleged failure or leak is determined to be a direct result of the product(s) as covered in this warranty and occurred during the warranty period” (emphasis added). The homeowners respond that SCC is a failure covered by the warranty.
The interpretation of Zurn’s warranty and its application to all of the dry plaintiffs is a common question that lends itself to efficient class wide resolution under Rule 23. Pella Corp. v. Saltzman, 606 F.3d 391, 394 (7th Cir.2010); see also Wolin v. Jaguar Land Rover N. Am., LLC, 617 F.3d 1168, 1173-74 (9th Cir.2010); Daffin v. Ford Motor Co., 458 F.3d 549, 553-54 (6th Cir.2006). While disputes about Rule 23 criteria may overlap with questions going to the merits of the case, the district court should not resolve the merits of the case at class certification. Blades, 400 F.3d at 567. If, at a later date, the court were to conclude that the dry plaintiff claims are indeed barred by Zurn’s limited warranty, it may decertify the class or amend the class definition, see Fed R. Civ. P. 23(c)(1)(C); Daffin, 458 F.3d at 554, or grant summary judgment to Zurn on such claims under Rule 56. For these reasons we find no abuse of discretion in the district court’s decision to *618 certify a warranty class including these plaintiffs.
V.
Zurn also argues that the district court erred by certifying the warranty and negligence classes because their common questions do not predominate over individual questions. See Fed. R.Civ.P. 23(b)(3). We review the district court’s rulings on issues of law de novo and its application of the law for an abuse of discretion. Blades, 400 F.3d at 566.
Rule 23(b)(3)’s requirement that common issues of fact or law must predominate over individual questions “tests whether proposed class members are sufficiently cohesive to warrant adjudication by representation.” Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Individual issues are those which require “evidence that varies from member to member” to make a prima facie showing. Blades, 400 F.3d at 566. Common questions are those for which a prima facie case can be established through common evidence. Id. When determining “whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings,” but that inquiry should be limited to determining whether, if the plaintiffs’ “general allegations are true, common evidence could suffice to make out a prima facie case for the class.” Id. While limited in scope, this analysis should also be “rigorous.” Avritt, 615 F.3d at 1029.
Zurn complains about the district court’s mention of taking “the substantive allegations in the plaintiffs complaint as true” while considering a motion for class certification. Zurn contends that this premise “permeates all of the district court’s findings and conclusions” and cannot be reconciled with the requirement that it conduct a “rigorous inquiry” into whether liability “may be established with common evidence.” See Avritt, 615 F.3d at 1029. The homeowners respond first by pointing out that the district court recognized the requirement for it to conduct a rigorous analysis in the same paragraph containing the language criticized by Zurn. The court clearly stated that it would granted class certification “[o]nly after a rigorous analysis of the proposed class and the requirements of Rule 23,” citing General Telephone Co. of the Southwest v. Falcon, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The homeowners further emphasize that the rigor of the court’s analysis is shown by the facts that it rejected certification as to some of their claims and modified the scope of the class as to others.
Our review of the record and the district court’s certification order indicates that it conducted a rigorous inquiry to decide whether “common evidence could suffice to make out a prima facie case for the class.” Blades, 400 F.3d at 566. The court did not simply take as true all of the homeowner allegations. In addition to scrutinizing the testimony of the parties’ expert witnesses, the court carefully examined the homeowner claims along with Zurn’s defenses. In considering the homeowner request for class certification of their consumer protection claims, for example, it weighed and rejected their contention that they could prove by common evidence that all consumers “failed to receive the same material omission” of information “essential in making the decision to purchase” Zurn’s product.
A comparison of the consumer protection claims with the warranty and negligence claims is instructive. As we explained in In re St. Jude Medical, Inc., 522 F.3d 836, 838 (8th Cir.2008), “[i]n a typical common-law fraud case, a plaintiff must *619 show that he or she received the defendant’s alleged misrepresentation and relied on it.” Claims requiring individual proof of reliance are generally not amenable to class certification because common evidence could not “suffice to make out a prima facie case for the class.” See Blades, 400 F.3d at 566. In the case of warranty and negligence claims premised on a universal and inherent product defect, however, plaintiffs may rely on common evidence to establish a prima facie case because there is no similar individual reliance requirement for such claims.[7] See Minn.Stat. § 336.2-313, cmt. 3; Lubbers v. Anderson, 539 N.W.2d 398, 401 (Minn. 1995) (elements of a negligence claim); Peterson, 318 N.W.2d at 52-53 (elements of a warranty claim).
While the existence of individual defenses may be important in a court’s decision to certify a class, see St. Jude, 522 F.3d at 840, the relevance of such defenses must be subjected to the same rigorous inquiry as plaintiffs’ claims. The district court examined Zurn’s assertion that individual water conditions or faulty installation might have caused the alleged failures as opposed to a universal product defect. The court also considered the plaintiffs’ argument that there was not sufficient evidence showing that individual conditions or installation differences may have caused SCC in Zurn’s brass fittings.
With respect to the warranty claims the district court concluded that given the homeowner claim of a universal defect, the question of “proximate cause will not involve predominately individual determinations, and resolution of that issue would be common to the class.” Similarly, with respect to the negligence claims the court determined that “[t]he question of liability does not require the specific individually tailored examinations proposed by Zurn.” The district court stated that it was “convinced that the Plaintiffs have adduced sufficient evidence to support their theory of the case” in respect to the warranty and negligence claims.
The question at class certification is not whether the plaintiffs have already proven their claims through common evidence. Rather, it is whether questions of law dr fact capable of resolution through common evidence predominate over individual questions. Blades, 400 F.3d at 566-67. In light of the record and the district court’s predominance analysis, we discern no abuse of discretion in its decision to grant class certification as to the warranty and negligence classes.[8] Merits discovery remains to be undertaken in the district court and as it continues, the bases for the district court’s necessarily prospective rul *620 ings may change. The rules of civil procedure allow for flexibility if such changes are needed.
VI.
After thoroughly reviewing the record made in the district court in light of the controlling law, we conclude that the district court did not commit legal error or abuse its discretion. Accordingly, its class certification order is affirmed.

. This action only involves claims by Minnesota homeowners. Claims filed by plaintiffs in other states have also been consolidated in the District of Minnesota for pretrial proceedings by the Judicial Panel on Multidistrict Litigation. See 28 U.S.C. § 1407.

. The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

. The district court amended the class definition proposed by the homeowners by adding the word "Zurn" to clarify that members of the class must have a plumbing system with Zurn brass crimp fittings.

. It appears no other circuit has followed the approach advocated in American Honda, and at least one court sitting en banc has rejected it. See Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571, 602 n. 22 (9th Cir.2010) (en banc), *612 rev'd on other grounds, 564 U.S. -, 131 S.Ct 2541, 180 L.Ed.2d 374 (2011). While an Eleventh Circuit panel mentioned the case in a recent unpublished opinion, the issue in that case was the weight afforded to certain expert testimony, not its admissibility. Sher v. Raytheon, No. 09-15798, 419 Fed.Appx. 887, 890, 2011 WL 814379 at *3 (11th Cir. Mar. 9, 2011) (unpublished).

. The dissent notes that the Supreme Court recently “doubt[ed]” a district court's conclusion that “Daubert did not apply to expert testimony at the certification stage of class-action proceedings.” Wal-Mart v. Dukes, 131 S.Ct. at 2554. The district court here made no such conclusion. It rejected the homeowner contention that it should consider all evidence that was “not fatally flawed” and proceeded to apply Daubert by conducting a focused inquiry into expert reliability in light of the available evidence.

. While Zurn refers to these class members as “no injury” plaintiffs, that label presumes a negative answer to a contested question— whether or not these plaintiffs have suffered a legally cognizable injury. This group is thus more appropriately referred to as the "dry plaintiffs.”

. The allegation that all of Zurn’s brass fittings suffer from a universal defect along with the expert testimony which supports it differentiates this case from that recently considered by the Supreme Court in Wal-Mart v. Dukes. There, the plaintiffs sought certification of a nationwide class of over a million women who allegedly suffered sex discrimination by Wal-Mart. The Court concluded that the plaintiffs had not presented any "significant proof” that Wal-Mart had a "general policy of discrimination” which might have satisfied Rule 23(a)(2)’s commonality requirement. 131 S.Ct. at 2553. Here, in contrast, the evidence of a universal defect raises a critical question common to all members of the classes certified by the district court.

. The dissent indicates that it doubts whether the district court conducted a sufficiently "rigorous analysis” of the class certification questions presented. We note that the experienced trial judge in this case issued a 31 page order, examining the evidence produced with respect to each Rule 23 requirement for the three proposed classes. The time restraints faced by busy trial courts make it unrealistic to expect exhaustive and polished opinions on all the legal issues before them.