ACCEPTED
03-14-00131-CV
5903223
THIRD COURT OF APPEALS
AUSTIN, TEXAS
7/1/2015 2:50:35 PM
JEFFREY D. KYLE
CLERK

## NO. 03-14-00131-CV

### THIRD COURT OF APPEALS
### AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS

7/7/2015 9:06:00 AM

JEFFREY D. KYLE
Clerk

*ZBRANEK CUSTOM HOMES, LTD.*

**Appellant**

**v.**

*JOE ALLBAUGH AND DIANE ALLBAUGH*

**Appellees**

**Appealed from the 419th Judicial District Court of
Travis County, Texas**

_____

### SUPPLEMENTAL BRIEF OF APPELLEES
### JOE ALLBAUGH AND DIANE ALLBAUGH

_____

Suzanne C. Radcliff
Texas Bar No. 24014420
COZEN O'CONNOR
1717 Main Street, Suite 3400
Dallas, TX 75201
Telephone:  (214) 462-3000
Facsimile:  (214) 462-3299
Email:    scradcliff@cozen.com

Gregory S. Hudson
State Bar No. 00790929
COZEN O'CONNOR
One Houston Center
1221 McKinney Street, Suite 2900
Houston, Texas 77010
Telephone:  (832) 214-3900
Facsimile:  (832) 214-3905
Email:    ghudson@cozen.com

**ATTORNEYS FOR APPELLEES**

# TABLE OF CONTENTS

Overview ....................................................................................................1

Gharda USA, Inc. v. Control Solutions, Inc. .......................................2

The Allbaughs' Experts Proved Causation Using Nationally Recognized Investigation Protocols and Positive Evidence Regarding the "False Chimney" ................................................................................................4

    Cause and Origin Was Determined In Accordance with Nationally Accepted Investigation Protocols .................................................4

        All Experts Agree on the Area Where the Fire Began......................7

        The Allbaughs' Experts Properly Identified the Potential Causes of the Fire ....................................................................9

            Human Causes of the Fire Were Appropriately Eliminated ..................................................................12

            Expert Testimony From an Electrical Engineer Ruled Out An Electrical Cause for the Fire............................................13

            Expert Testimony From a Qualified Mechanical Engineer Eliminated a Gas Leak as a Potential Cause of the Fire .......16

        Expert Testimony Demonstrated That a False Chimney Caused the Fire ..................................................................18

            Expert Testimony Established That a False Chimney Existed...............................................................18

            Two Separate Construction Defects Account for the Observed Gaps ........................................................20

            Expert Testimony Established That the Fire Ignited the Combustible OSB ................................................24

Conclusion ...........................................................................................27

**Page(s)**

**Federal Cases**

*Butcher v. Allstate Ins. Co.*,
   No. 1:06cRR423, 2009 U.S. Dist. LEXIS 13284, 2009 WL 301822
   (S.D. Miss. Feb. 5, 2009) ...................................................................................4

*Jackson v. Black & Decker (US), Inc.*,
   2008 U.S. Dist. LEXIS 123918 (N.D.Tex. 2008) ..............................................15

*Russ v. Safeco*,
   2013 U.S. Dist. Lexis 42333 (S.D.Miss. 2013) ..................................................4

*Russell v. Whirlpool Corp.*,
   702 F.3d 450 (8th Cir. 2012) ..............................................................................4

*Schlesinger v. United States*,
   898 F. Supp. 2d 489, 2012 U.S. Dist. LEXIS 15754, 2012 WL
   407098 (E.D.N.Y. 2012) ......................................................................................4

**State Cases**

*Ford Motor Co. v. Aguiniga*,
   9 S.W.3d 252 (Tex. App.-- San Antonio 1999, pet. denied) ..............................15

*Gharda USA, Inc. and Gharda Chemicals, Ltd. v. Control Solutions,*
   *Inc.*,
   Cause No. 12-0987, --S.W.3d—(Slip Op. May 8) ..........................1, 2, 3, 27, 28

*Tata v. State*,
   446 S.W.3d 456 (Tex.App.—Houston [1st Dist.] 2014, pet.
   refused) ................................................................................................................7

*Whirlpool Corp. v. Camacho*,
   298 S.W.3d 631 (Tex.2009).................................................................................26

**Rules**

Texas Rule of Appellate Procedure 9.4(e)................................................................30

Texas Rule of Evidence 703 .......................................................................................3

## SUPPLEMENTAL BRIEF OF APPELLEES,
## JOE AND DIANE ALLBAUGH

### *Overview*

Appellant, Zbranek Custom Homes, filed a post-submission brief in an effort to re-argue evidentiary issues which both the trial court and jury heard and resolved against Appellant. Appellant attempts to use the *Gharda*[1] case as a vehicle, but the *Gharda* case announces no rule of law relevant to this case or the evidence presented.

In *Gharda*, a complex chemical fire case, the plaintiff's experts hypothesized that the cause of the fire was the ignition of chemical fumes within a confined space. However, the experts could only speculate both that Gharda's conduct resulted in the presence of ignitable fumes and that such fumes were present in sufficient volume to cause the explosion.

In this case, the fire was caused by a "false chimney," a gap in the area around a firebox which allowed heated gasses to migrate around the firebox into areas where combustible materials are located. "False chimneys" present a known hazard in fireplace construction and are specifically prescribed by the National Fire Protection Association, the fireplace instruction manual and the applicable Residential Building Code. The "false chimney" existed because Appellant,

---

[1] *Gharda USA, Inc. and Gharda Chemicals, Ltd. v. Control Solutions, Inc.*, Cause No. 12-0987, --S.W.3d—(Slip Op. May 8, 2015).

1

Zbranek Custom Homes, installed the fireplace in violation of these standards, a failure which Appellant admitted during examination. The Allbaughs presented evidence eliminating other potential causes of the fire (i.e. human error, electrical failure and gas leak) along with positive evidence showing both how Appellant's installation methods created the false chimney and scientific evidence regarding ignition of combustible materials. At trial, Appellant vigorously, but unsuccessfully, cross-examined witnesses about these issues.

### *Gharda USA, Inc. v. Control Solutions, Inc.*

In *Gharda*, the plaintiff, Control Solutions, Inc., suffered a fire loss. Control Solutions alleged that chemicals (chlorpyrifos) manufactured by Gharda contained excessive amounts of EDC, a flammable substance. EDC is used in the production of chlorpyrifos, but is removed before the product is shipped such that the shipped product is 99% pure. Control Systems argued that "human error" allowed excess EDC to be present in the chlorpyrifos such that an ignition could occur. Thus, to prove its case, Control Systems had to prove that: (1) the chlorpyrifos was contaminated with EDC; (2) EDC contamination caused an exothermic reaction that released flammable gases; and (3) spontaneous combustion or static electricity ignited the vapors and caused an explosion.

Unfortunately for Control Systems, its experts could only testify that contamination due to "human error" during the manufacturing process was

"possible" and admitted there was neither an indication of the amount of EDC allegedly present nor that the amount of EDC present was sufficient to cause the exothermic reaction which allegedly led to an explosion. As a result, the Texas Supreme Court rendered judgment that Control Systems take nothing, as there was no evidence that the conduct of Gharda led to the explosion. The Court stated that:

> Each of these shortcomings on its own would be sufficient to support a conclusion that [Control System's expert] lacked a reliable foundation to testify that Gharda Chemical manufactured drums of chlorpyrifos that were contaminated with EDC. Considered together, it is even more apparent that [expert] testimony suffers from analytical gaps and is "connected to existing data only by the *ipse dixit* of the expert." This type of connection is unreliable, and is therefore not evidence.[2]

The Texas Supreme Court noted that "no rule prohibits experts from using other experts' opinions to formulate new opinions based on their own expertise. In fact, Texas Rule of Evidence 703 and our prior cases contemplate exactly such an arrangement."[3] However, absent positive evidence of contamination due to the conduct of Gharda, there was no evidence to support an essential element of Control Systems' negligence and manufacturing defect claims.[4]

In essence, *Gharda* stands for the unremarkable proposition that an expert cannot rely on unreliable data when expressing an opinion. As will be explained below, the facts and evidence in the instant case are vastly different.

---

[2] *Id.*, at *18.
[3] *Id.*, at *20.
[4] *Id.*, at *23.

***The Allbaughs' Experts Proved Causation Using Nationally Recognized
Investigation Protocols and Positive Evidence Regarding the "False Chimney"***

*Cause and Origin Was Determined In Accordance with
Nationally Accepted Investigation Protocols*

Determination of the cause and origin of a fire is a common practice done in accordance with the standards set forth by the National Fire Protection Association (NFPA), a professional group of investigators whose collective knowledge and experience has been distilled and reduced to a usable guide.

NFPA 921 defines the scientific method to be followed by origin and cause investigators.[5] NFPA 921 is a nationally recognized protocol for investigation, and courts have specifically upheld its use in cause and origin investigations.[6] The Allbaughs' cause and origin expert, Mr. Michael Chaney, described the investigative process prescribed by NFPA 921 in the following manner:

> Q.  Explain to the jury what the scientific method is?
>
> A.  It is a systematic methodology for investigating whatever you're investigating. You have to recognize that there's a problem—in this case there's a fire—and you want to figure out

---

[5] RR6, page 169, line 4 – 15.

[6] See, e.g. *Russell v. Whirlpool Corp.*, 702 F.3d 450, 454 (8th Cir. 2012) (quoting NFPA 921 § 1.2.1 and stating that "The NFPA is a nonprofit organization dedicated to fire prevention, and NFPA 921 is a document intended to 'establish guidelines and recommendations for the safe and systematic investigation or analysis of fire and explosion incidents.'"). See also *Russ v. Safeco*, 2013 U.S. Dist. Lexis 42333, *70-72, (S.D.Miss. 2013); *Schlesinger v. United States*, 898 F. Supp. 2d 489, 2012 U.S. Dist. LEXIS 15754, 2012 WL 407098, at *15 (E.D.N.Y. 2012); *Butcher v. Allstate Ins. Co.*, No. 1:06cRR423, 2009 U.S. Dist. LEXIS 13284, 2009 WL 301822, at *3 (S.D. Miss. Feb. 5, 2009). Moreover, courts often exclude expert testimony that fails to comport with NFPA 921 standards when an expert explicitly references the guide in reaching his conclusions. *See, e.g.*, *Russell*, 702 F.3d at 455; *Schlesinger*, 2012 U.S. Dist. LEXIS 15754, 2012 WL 407098, at *15.

what the cause is, and then you want to go out to that place and you want to gather as much data as you can, the data about the fire event, the circumstances that brought an ignition source together, you know, with the fuel, and you want to think of all the possibilities in that area of origin. Could it be electrical, could it be plumbing, could it have been combustibles too close to something, could it have been a human factor involved in causing this fire?

So you want to gather all the data about that, and then you synthesize that and you think about, well, if I had that, what would I—what would be the proof of that. So you go through a thought process. You gather all the data in, you massage all the data, and then you come up with these theories and try to eliminate it down to one probable cause.[7]

Stated differently, once the area of origin is determined, the investigator identifies the possible causes of the fire within that area. The investigator then separately examines each potential cause to determine whether that cause can be ruled in or ruled out as the culprit. If more than one cause cannot be eliminated, the cause of the fire is "undetermined." Importantly, all the experts, independent,[8] plaintiff[9] and defense,[10] agreed that NFPA 921 defined the accepted protocol for fire cause and origin determinations.

In this case, application of NFPA 921 investigative methodology showed the following. First, the area in which the fire began was the interstitial, or void, space

---

[7] RR6, 171, line 20 – page 172, line 15.
[8] Fire Chief Mike Lacey testified that NFPA 921 is the guideline for investigations. RR3, page 81, line 4 – 20. Chief Lacey used NFPA 921 to investigate cause and origin of the fire at the Allbaugh home. RR3, page 82, line 18 – 23.
[9] RR6, page 169, line 4- 15.
[10] RR10, page 127, line 12 – page 128, line 24.

above the fire box. All investigators, including District Fire Chief Mike Lacey, agreed on this area of origin.[11] Second, given the area of origin, several potential causes could explain the fire: (1) human error; (2) the presence of an electrical outlet; (3) the presence of a gas pipe; and (4) the presence of a false chimney.[12] An electrical engineer examined the outlet and wiring and concluded that no electrical failure accounted for the fire. A mechanical engineer examined the gas pipe and concluded that a gas leak did not cause the fire. Third, positive evidence showing the "false chimney" did cause the fire was provided by the mechanical engineer, a construction professional and the Allbaughs' cause and origin expert. This is precisely the investigation method and analysis contemplated by NFPA 921.

Appellant does not challenge directly the applicability of NFPA 921 or its authority as the standard for investigators. However, Appellant makes an implicit challenge to NFPA 921, arguing that the Allbaughs should have recreated the fireplace in question to test whether or not a false chimney could have allowed sufficiently hot gases to ignite the improperly installed OSB. NFPA 921 does not require such testing,[13] a fact also confirmed by Appellant's expert, Mr. Nichols.[14]

---

[11] RR3, page 125, line 22 – page 126, line 22 (Chief Lacey); RR6, page 171, line 1 – line 10 (Mr. Chaney); RR10, page 113, line 21 – page 114, line 17. (Mr. Nichols).

[12] As discussed *infra*, Appellant's experts included a "false chimney" in the group of possible causes of the fire due to the well-established risks associated with false chimneys and the presence of gaps around the firebox which would allow heated gases to migrate into the area where the fire began.

[13] RR6, page 173, line 12 – 16.

[14] RR10, page 127, line 12 – page 128, line 24.

6

Were the court to accept Appellant's challenge, the Court would in effect re-write the national protocol for cause and origin investigations to require recreation testing when the collective experts in the field have agreed that such testing is not required and thereby potentially invalidate thousands of investigations which otherwise complied with NFPA 921. NFPA 921 investigations are used in a variety of contexts, including arson investigations. Thus, requiring re-creation testing could, among other consequences, potentially invalidate the testimony used by courts to convict arsonists of criminal activity.[15]

*All Experts Agree on the Area Where the Fire Began*

Under NFPA 921, the first step in an investigation requires an investigator to identify the area in which the fire began. Here, all experts agreed that the fire began in the void space above the firebox.[16] The investigating fire department district chief, Mr. Mike Lacey, prepared a report which was introduced as Exhibit 6:[17]

---

[15] For instance, Fire Chief Mike Lacey testified that he followed NFPA 921 when investigating potential arson claims. RR3, page 81, line 21 – page 82, line 10. For a case law example of NFPA 921 being used to support an arson conviction, see *Tata v. State*, 446 S.W.3d 456, 465 (Tex.App.—Houston [1st Dist.] 2014, pet. refused).

[16] RR6, page 202, line 25 – page 203, line 22; page 203, line 9 – page 205, line 9. (Mr. Chaney); RR10, page 113, line 21 – page 114, line 17 (Mr. Nichols).

[17] RR15, pages 18-82. Appellant did not challenge the training or expertise of Chief Lacy to testify as an expert regarding fire investigations or his conclusions about the fire cause and origin. RR3, page 78, line 4 – page 81, line 3. Among other training and experience, Mr. Lacey is a certified fire investigator and has been performing fire origin investigations since 2002. He also is a member of the International Association of Fire Marshalls and has received training from that organization. Chief Lacey testified that NFPA 921 was the guideline for fire

Using my training and experience in reading fire patterns and burn indictors, I have concluded that this fire started in the combustible void space around the exterior attached fireplace. Based on this information, the interviews conducted, and not finding any other sources of ignition, I have also concluded that this fire is accidental in nature and caused by a fire in the fireplace igniting combustible materials located within the void space the fire box was recessed into.[18]

Chief Lacey supported this finding in testimony by showing the jury numerous photos of the fire scene which documented the burn patterns present and how the fire spread from the area around the outside fireplace, up into the attic of the Allbaughs' home and then into the interior of the home.[19]

Chief Lacey also noted an important abnormality[20] in the exterior fireplace which he observed during his investigation; namely a quarter inch gap which ran across the entire top of the fire box and also along its sides.[21] Chief Lacey also observed the presence of combustible materials in the gap space.[22] Although Chief Lacey did not render a conclusion about the cause and origin of the fire, as his job was simply to rule out arson as a cause, Chief Lacey testified as follows:

> Q. So tell us, after you did this—took all your photos and looked inside the firebox itself, did—what did you do next?

---

examinations and that he followed NFPA 921 in making his investigation. RR3, page 81, line 4 – page 82, line 20.
[18] RR15, page 42.
[19] RR3, page 89, line 13 – page 107, line 23; page 115, line 3 – 126, line 22.
[20] RR3, page 122, line 17 – 22.
[21] RR3, page 123, line 14 – page 124, line 22.
[22] RR3, page 120, line 8 – 21.

A. At that point, I made some conclusions. I looked at the fire patterns. I recall the witness statements that I heard about that they had been burning the fire in the firebox since about 6:00 p.m. And around the incident, at approximately midnight, there was a pretty long period of time the fire was occurring inside that firebox.

The fact that – that we observed when I looked over the wall into the crevice--- the – basically the void space, there was a heavy consumption of wood material, the framing of the void space behind the firebox. And so my conclusion that I made was that the fire, had progressed out of that firebox into that void space, which then matched the witness statements and the engine crew's response that the fire was inside that void space behind the firebox and progressed up into the attic area and then progressed into the house. And that matched all the fire patterns that I had observed throughout the rest of the house.

Q. Did you conclude that the fire in the firebox escaped the firebox in some way?

A. That was my conclusion, yes, ma'am.[23]

Chief Lacey also testified that the burning of oriented strand board (OSB) found in the void space around the firebox would account for the colored burn patterns observed in those areas.[24]

In its post-trial brief, Appellant argues that the Allbaughs' experts assumed an area of origin of the fire. Simply, this assertion is not true.

*The Allbaughs' Experts Properly Identified the Potential Causes of the Fire*

After determining the area of origin of a fire, NFPA 921 requires that the potential causes of the fire be identified so that each can be separately examined.

---

[23] RR3, 125, line 22 - 126, line 22.
[24] RR3, 181, line 21 – 182, line 8.

The Allbaughs' cause and origin expert, Mr. Mike Chaney, described the process and his conclusion as follows:

> Q.    All right.  And did you come up with the potential ignition sources within the area of origin?
>
> A.    Yes.
>
> Q.    Okay.  Can you tell us what the potential ignition sources are?
>
> A.    Well, there's a fireplace, so the first thing I'm considering is human factors.
>
> Q.    Okay.
>
> A.    What did the humans do.
>
> Q.    All right.  Are there other potential ignition sources?
>
> A.    Yes.  In this area, there was an electrical circuit, and in the general area, there's a third thing, which was plumbing, which is the gas.  That's really a fuel source.  It's not the ignition source, but it's related.
>
> Q.    Okay.
>
> A.    And then four would be combustibles.  Are there combustibles in this area where they should be, are there some where they should not be.[25]

The Allbaughs' experts included placement of combustibles as a possible cause based on the well-known risks associated with false chimneys.  Specifically, the fireplace manual warns against allowing combustible material within 8 inches

---

[25]  RR6, page 177, line 8 – page 178, line 2.

of the firebox due to the risk of ignition.[26]  Additionally, the firebox itself presents a label instructing installers to allow an 8 inch clearance for combustible material.[27]  The installation instructions also contain express warnings regarding the risks associated with a failure to seal all joints with a heat resistant mortar, noting that a failure to seal the joints "**will create**" a false chimney.[28]  Another section of the NFPA, section 211, also instructs that combustible material be at least 8 inches from a firebox.[29]  Finally, the applicable building codes also require at least 2 to 8 inches clearance between the firebox and combustible materials.[30]  These required clearances are the result of testing performed by the fireplace manufacturer and by Underwriters Laboratory.[31]  There is no dispute in this case— the fireplace installed by Appellant did not allow the required clearance by placing combustible OSB within an inch of the firebox.  Appellant admitted:

> Q.    All right.  Did you comply—did Zbranek Custom Homes— y'all approved the OSB within the eight inches of this little red zone here that would be in violation of NFPA 211.  Correct?
>
> A.    We approved it, yes.
>
> Q.    And it violates the NFPA 211, doesn't it.

---

[26]  Exhibit 15, RR15, page 264 – 312 (specifically, page 272 states "The Standard fireplace and DM 54 chimney system is tested and listed for installation with "clearance to combustibles" as follows: . . . all combustible sheathing materials must be held eight inches (8") away from the sides of the firebox opening and eight inches (8") above the top of the firebox opening."
[27]  Exhibit 15, page 269.
[28]  Exhibit 15, RR15, page 285.  Emphasis added.
[29]  RR7, page 19, line 19 – page 93, line 9.
[30]  RR7, page 91, line 7 – line 20.
[31]  RR5, page 166, line 17 – page 168, line 6.

A.    I guess.

Q.    Well, you don't know one way or another.  Is that what you're—

A.    No.  I think that there are different interpretations.  And—and put literally, the way you've asked the question, yes.

Q.    So literally, you violated the NFPA 211.  Correct?

A.    Yes.

Q.    Not only on the top of the firebox, but on sides, too.  Is that correct?

A.    Yes.

Q.    And you violated—the construction violated on the sides of the firebox the International Residential Code, too, didn't it?

A.    Yes.

Q.    And it violated the installation manuals, didn't it?

A.    Yes.[32]

With the potential causes of the fire and the area of origin identified, Mr. Chaney then followed the protocols of NFPA 921 to examine each potential cause.

*Human Causes of the Fire Were Appropriately Eliminated*

As noted above, Chief Lacey eliminated the potential for an intentional fire (i.e. arson) during his investigation.  Mr. Chaney also eliminated human causes as being the source of the fire based on interviews with the Allbaughs regarding how and when the fireplace was used, when the gas log was turned off, the absence of

---

[32]  RR7, page 93, line 3 – page 94, line 7.

ignitable liquids (i.e. lighter fluids), use of a fire screen, and related data.[33] Appellant did not challenge the elimination of human factors as a potential cause of fire at trial and does not raise the issue on appeal.

*Expert Testimony From an Electrical Engineer*
*Ruled Out An Electrical Cause for the Fire*

Mr. Chaney did not believe electrical factors played a role in the fire because there was no evidence of anything being plugged in to the outlet and therefore no electrical load would flow to the outlet.[34] Mr. Chaney also noted the unlikely timing for an electrical fire, as the electrical fire would have to start at the same time the fireplace was first used, despite having been in place for 18 months previously.[35] As a new home, Mr. Chaney believed that an electrical fire would be prevented by a ground fault interrupt, which would stop the flow of electricity to the outlet before any fire could begin.[36] Mr. Chaney also noted that a fire originating at or around the electrical outlet would present a different burn pattern than the pattern present at the Allbaughs' home. Mr. Chaney showed the jury photographs of the fire scene, demonstrating how the burn patterns did not emanate from in or around the electrical outlet and describing what the burn patterns would look like had the fire emanated from the electrical outlet.[37] Finally, Mr. Chaney

---

[33] RR6, page 178, line 6 – page 180, line 25.
[34] RR6, page 181, line 4 – 9.
[35] RR6, page 181, line 10 – 13.
[36] RR6, page 181, line 19 – page 182, line 11.
[37] RR6, page 182, line 12 – page 188, line 23.

pointed out that a fire originating at the electrical wiring would damage the inside of the electrical plate, damage not shown in the collected physical evidence.[38]

Despite this conclusive evidence, Mr. Chaney also looked to the opinions of Mr. Mark Goodson, a licensed professional engineer.[39] Mr. Goodson excluded an electrical cause of fire originating at the outlet above the exterior fireplace based on several factors: (1) the outlet in question was protected by a ground fault interrupt, which would stop the flow of electricity to the outlet before there was sufficient power to start a fire;[40] (2) there was no evidence of electrical shorting;[41] (3) witness interviews indicated that nothing was plugged into the outlet, which would render any current insufficient to start a fire;[42] and (4) there was no evidence of any electrical arcing.[43]

Appellant and third-party defendant unsuccessfully attempted to cross-examine Mr. Goodson, arguing that it was theoretically possible for accidental

---

[38] RR6, page 189, line 3 – 20.
[39] Appellant did not challenge Mr. Goodson's qualifications as an expert on electrical issues. However, the Court can take note of his extensive qualifications in the field of electrical engineering. Mr. Goodson has a bachelor of science from Texas A&M and is a licensed engineer in 13 states. In the 29 years he has been licensed, Mr. Goodson has investigated over 3,000 electrical fires. He has worked for the State Fire Marshall's Office and as part of the National Response Team for the Bureau of Alcohol, Tobacco and Firearms. Mr. Goodson is the author of 35 papers on fire and fire investigation. Important to this case, he also possesses significant experience in dealing with ground fault interrupters. See, RR3, page 194, line 7 – 197, line 20.
[40] RR3, page 201, line 11 – page 204, line 8.
[41] RR3, page 204, line 15 – page 205, line 11.
[42] RR3, page 206, line 9 – page 207, line 9.
[43] RR3, page 208, line 17 – page 209, line 21.

14

resistance to be on the electrical line.[44]  Such resistance could come in the form of an insect nest being built in balance over the electrical lines or a Christmas wreath with prongs sticking into the outlet.  Appellant never attempted to argue or show that either scenario was sufficiently probable to require analysis, and never attempted to show that either scenario, if true, would be even remotely plausible given the absence of arcing, scoring or other indicia of a fire originating at or near the outlet.[45]  Mr. Goodson reaffirmed his opinion that such factors did not change his opinion as to whether or not there was an electrical cause for the fire.[46]

Simply, Appellant attempted to convince the jury that Mr. Goodson's opinion was flawed based on two hypothetical and highly unlikely occurrences for which there was no positive evidence and all secondary evidence was inconsistent. Unsurprisingly, the jury was not persuaded by this line of questioning.  Similarly, in its brief, Appellant argues that Mr. Goodson failed to rule out an electrical cause of fire.  However, this is not the legal standard and mischaracterizes the evidence.

---

[44]  RR4, page 62, line 23 – page 63, line 4.

[45]  Although an expert needs to exclude potential causes of an event, the expert does not need to exclude every single hypothetically possible cause of an event; only those potential causes which have a reasonable likelihood of occurring.  See, *Ford Motor Co. v. Aguiniga*, 9 S.W.3d 252, 264 (Tex. App.-- San Antonio 1999, pet. denied). In addressing the opponent's argument that the trial court erred in admitting expert testimony because the experts failed to rule out other plausible causes of the engine failure, the court shifted the burden back to the manufacturer stating, "Ford did not develop an argument... that another system failure [other than the fuel pump relay] caused the engine to stall or the brakes and steering to fail." Id. Thus, the court noted that before an expert will be required to rule out other causes, the opponent must demonstrate the existence of other plausible causes. *Id*.  Importantly, Appellant's experts do not testify, must less justify, that either scenario is in any way plausible.

[46]  RR4, page 75, line 17 – page 76, line 9.  A similar challenge was rejected in *Jackson v. Black & Decker (US), Inc.*, 2008 U.S. Dist. LEXIS 123918, *19 (N.D.Tex. 2008).

Mr. Goodson acted as a qualified expert and appropriately excluded an electrical fire source. Mr. Chaney was entitled to rely on his findings and did so when excluding this potential cause of the fire.[47]

*Expert Testimony From a Qualified Mechanical Engineer*
*Eliminated a Gas Leak as a Potential Cause of the Fire*

As noted above, the presence of a gas pipe near the area of fire origin required that the possibility of a gas fire be examined. In fact, during the post-fire testing, the gas line was shown to have a small leak.

Mr. Chaney then discussed whether plumbing or gas could account for the fire. Mr. Chaney testified a very small gas leak existed in the gas line leading to the fireplace, but that the size of the leak would not produce sufficient gas to ignite, as the gas would dissipate.[48] Mr. Chaney also discounted a gas ignition based on the lack of an audible explosion reported by the Allbaughs and the absence of any gas smell.[49] Additionally, Mr. Chaney noted that the gas line had been pressure tested before the fireplace was used and was found to have no leaks.[50] Mr. Chaney also noted the absence of burn patterns near the gas line or in the area where gas

---

[47] RR6, page 190, line 19 – 21.
[48] RR6, page 191, line 4 – 10.
[49] RR6, page 191, line 11- 14.
[50] RR6, page 191, line 14 – 21.

would be expected to migrate.[51]  Based on this investigation, Mr. Chaney stated that he was able to eliminate gas as a potential cause of the fire.[52]

Mr. Chaney also looked to the opinions of mechanical engineer, Mr. Paul Carper, to exclude a gas leak as the cause of the fire.[53]  Mr. Carper examined the gas line because it was in the area of fire origin.[54]  To inspect the gas line, gas at a pressure of twenty times the norm was fed through the line to see if any observable leak was present.[55]  However, the size of the leak was minimal.  To rule out a pre-fire gas leak as a cause of the accident, Mr. Carper noted that a pre-fire inspection of the gas line showed no indication of a leak.[56]  The fireplace had not been used between the time of the inspection and the date of the fire.[57]  Mr. Carper also noted the absence of any reports of a gas smell or a gas explosion noise, which would be expected if a gas leak ignited.[58]  Further, based on the size of the leak, Mr. Carper noted that any escaping gas would dissipate through the fireplace flue.[59]  Rather than pre-date the fire, Mr. Carper testified that it was probable that the leak was

---

[51]  RR6, page 192, line 16 – page 193, line 5
[52]  RR6, page 192, line 6 – 8.
[53]   As with Mr. Chaney, Appellant did not challenge Mr. Carper's qualifications to opine as an expert.  In brief, Mr. Carper holds a bachelor of science in mechanical engineering from Texas A&M.  He has been a licensed professional engineer since 1993 and holds a P.E. license in five states.  He has acted as a forensic consultant since 1998.  As part of this training, Mr. Carper has extensive training regarding gas lines and gas appliances.  He also has experience and training in materials analysis.  RR5, page 141, line 17 – page 146, line 15.
[54]  RR5, page 147, line 18 – 25.
[55]  RR5, page 148, line 5 – page 149, line 11.
[56]  RR5, page 155, line 8 – 25.
[57]  RR5, page 156, line 1 – 15.
[58]  RR5, page 157, line 2 – 6.
[59]  RR5, page 156, line 16 – page 157, line 1.

caused during the fire, when the heat caused the interior seal of the gas line to fail, which would be expected as the fire in the firebox would be approximately 1880 degrees Fahrenheit.[60] For these reasons, Mr. Carper testified that he was able to eliminate a gas leak as a possible cause of the fire.[61]

Given this investigation and testimony, Mr. Chaney was entitled to rely on Mr. Carper's opinion that a gas leak did not cause the fire in question.

*Expert Testimony Demonstrated That a False Chimney Caused the Fire*

The Allbaughs' experts did not rely on simple process of elimination to conclude that a false chimney caused the OSB to ignite. Instead, the Allbaughs' experts followed the nationally recognized investigation methodology of NFPA 921 when they examined the physical evidence present at the fire scene and relied on published scientific data and studies to reach their conclusions.

*Expert Testimony Established That a False Chimney Existed*

Consistent with NFPA 921, Mr. Chaney investigated whether or not a false chimney exposing combustible material to heat existed. Mr. Chaney visited the fire scene on the day after the fire. On investigation, he found gaps surrounding the stone fireplace:

---

[60] RR5, page 154, line 14 – page 155, line 7. Mr. Chaney echoed this conclusion, testifying that the leak was the likely result of the fire and the normal expansion/contraction of metals in the gas line. RR7, page 76, line 21 – page 77, line 2.

[61] RR5, page 159, line 1 – page 160, line 9.

Q.   Before any removal of stone, were there any gaps in the front facing of the fireplace?

A.   Yes.

Q.   All right. Where did you see the gaps?

A.   Gaps, gaps, everywhere gaps. No, there was gaps. There was gaps at the sidewall, there was gaps at the opening. So if you were to put your head down in the opening of the fireplace and look upward, you'd see a gap where the stucco came over and was at its edge. If you're looking at it from that perspective, the outside of the stucco, the finished part, is out here (indicating) and the metal lath is in here and the fireplace is over here. So when you're looking at that, in here there was a gap. And on the side walls where the stucco meets the fireplace, there was a gap on both sides.

*****

Q.   In your experience as a origin and cause investigator, are there supposed to be gaps around the fireplace opening?

A.   There should not be any.

Q.   Why not?

A.   Hot gasses or radiant heat, combination of the heat transfer mechanisms can get in through a gap and if there's a combustible too close to that opening, it can begin a glowing fire or smoldering fire and then spread the fire.[62]

Mr. Chaney also showed the jury photos of the fireplace which identified the location of the gaps in question.[63] Mr. Chaney then testified about the burn patterns noted on the fireplace and specifically in the space behind the "gap" areas,

---

[62] RR6, page 199, line 5 – page 200, line 16.
[63] RR6, page 200, line 17 – page 202, line 8.

19

noting that the burn patterns showed those areas as the point of origin for the fire.[64]

Mr. Chaney showed the jury photographs of the discolored stucco, further demonstrating the area of fire origin.[65]

Appellant does not dispute the existence of post-fire gaps surrounding the fire box. Instead, Appellant argues that there is no evidence these gaps existed prior to the fire. As the below evidence shows, Appellant's assertion ignores the evidence at trial.

*Two Separate Construction Defects Account for the Observed Gaps*

Gaps between the firebox and the surrounding stucco were the result of two construction defects by Appellant. First, rather than follow the correct installation methods, Appellant attempted to wrap the stucco around the combustible OSB, but did so without providing support for the stucco. Second, Appellant failed to apply a fire-resistant mortar at the various joints around the firebox.

Mr. Mark Stanford, a construction professional,[66] testified about the defective stucco installation. Specifically, Mr. Stanford noted that both the International Residential Building Code and the NFPA both discuss the clearances

---

[64] RR6, page 202, line 25 – page 203, line 22; page 203, line 9 – page 205, line 9.
[65] RR6, page 210, line 25 – page 212, line 5.
[66] Appellant did not contest Mr. Stanford's qualifications to discuss construction practices at trial. Mr. Stanford has been in the construction business since 1961. He owns two companies, one which is a construction company and the other which provides consulting services, including forensic analysis. He has specific training in air pathways around fireplaces and has supervised the installation and repair of fireplaces. Mr. Stanford was familiar with both the installation manual for the Allbaughs' fireplace and with the applicable building codes for the Allbaughs' home. RR8, page 151, line 9 – 161, line 11.

to keep combustible materials like OSB away from fireplace openings.[67] Both documents require that any combustible material be at least 8 inches away from the firebox on all sides.[68] The NFPA and fireplace installation manual also require that all joints be sealed using a fire-resistant mortar.[69]

Mr. Stanford testified that the reason for these clearances was avoidance of fire due to a "false chimney." Mr. Stanford read to the jury from the installation manual the following warning about this risk:

> Important. Failure to seal any gaps between the front face of the standard fireplace and the back of the noncombustible finish facing material will create what is known as a false chimney. A false chimney in this case is the narrow gap mentioned above between the back of the non-combustible facing material at the top of the firebox opening and the rough front of the standard smoke done. If left unfilled, this gap creates a false chimney which can cause a fire hazard by drawing considerable heat out of the firebox and into the space behind the noncombustible finish facing, and from there up into the wall cavity behind the drywall or other sheathing material that houses a standard fireplace.[70]

Mr. Stanford went on to testify about the stucco installation at the fireplace. In addition to improperly placing combustible OSB too close to the firebox,[71] Appellant also used improper stucco installation methods. Specifically, the stucco was applied at the firebox in a manner which was not stable because the wire corner bead was cut and no metal lathe was used beneath it. As a result, the stucco

---

[67] RR8, page 161, line 12 – 14;
[68] RR8, page 162, line 4 – page 165, line 24.
[69] RR8, page 166, line 24 – page 169, line 10.
[70] RR8, page 170, line 2 – 15. Exhibit 15.
[71] RR8, page 174, line 16 – page 175, line 14.

assembly was unstable and unable to create an airtight seal.[72] More important, the improper stucco installation would leave a narrow gap behind that installation.[73] Further, the improper installation placed several dissimilar materials next to one another, but, absent bonding, allowed for narrow pathways through which air and heat could migrate.[74] To prevent such migration, Mr. Stanford testified that a heat resistant mortar should have been applied at the joint. However, his inspection showed no such mortar present.[75] Mr. Stanford's opinions were echoed by Mr. Joe Stevens, the manufacturer representative for the fireplace. Mr. Stevens testified that when he inspected the fireplace that the manufacturer required clearances for combustibles had not been maintained.[76] Additionally, Mr. Stevens also noted the gaps around the fireplace and that there was no evidence of proper mortar.[77] Finally, in the early stages of the fire, one witness, Mr. David Birdwell, testified that he went over to the fireplace, looked up and saw the fire burning through one of the gaps:

> Q. So what did you do next did? Did anyone get waken up, or did you do more to the fireplace?

---

[72] RR8, page 175, line 15 – page 181, line 20. Mr. Stanford also demonstrated the improper stucco assembly in court using material gather from the fire scene and photographs taken showing the assembly.
[73] RR8, page 182, line 3 – 186, line 17.
[74] RR8, page 182, line 7 – 15, page 184, line 11.
[75] RR8, page 186, line 18 – page 188, line 17.
[76] RR8, page 70, line 3 – 14.
[77] RR8, page 70, line 15 – page 71, line 15.

A.    Well, I—I took a closer look at the fireplace.  I actually sat down on the—the stone slab that was in front of the fireplace and just took a closer look at the inside of the fireplace.

And at that point, I saw a gap between the stone facing of the fireplace and the actual firebox.  And within that gap, there were—there was a glowing debris.  So something not in the firebox itself was on fire.  And as I—I actually stuck my head into the fireplace to do this, that's how little heat there was left.  I kind of blew into that gap, looking up.  And there was glowing debris falling out.  It kind of looked like—like—I don't know, like something fibrous, like glowing asbestos or—or something that had adhesive in it, like burnt particle board or something like that.[78]

At trial, and in its brief, Appellant contends that "no evidence shows that a false chimney existed before the fire."  Appellant's evidence consists of the denial of Mr. Zbranek and other installers, which the jury was entitled to discount as being that of an interested party.  Such a disbelief was quite reasonable, given that Mr. Zbranek testified that he could not recall using the required fire-resistant mortar to seal the fireplace[79] and also had no explanation for how the post-fire gaps occurred.[80]  Indeed, Mr. Zbranek testified that he was not aware that fire-resistant mortar needed to be used in the installation of the fireplace.[81]  Mr. Zbranek also could not recall why he determined a non-approved installation was appropriate[82]

[78]  RR3, page 46, line 24 – page 47, line 16.
[79]  RR7, page 113, line 22- page 114, line 2; page 128, line 5 – 14.
[80]  RR7, page 127, line 25 – page 128, line 4; page 128, line 14 – 17.
[81]  RR8, page 45, line 11 – 21.
[82]  RR7, page 123, line 12 – page 124, line 6.

and admitted he would not approve a similar construction in the future.[83] However, as noted above, positive evidence of a pre-existing gap came from Mr. Birdwell, who observed the fire through the gap and from Mr. Stanford, who testified that the defective stucco installation and failure to seal the fireplace joints left numerous gaps through which air and heat could travel.

*Expert Testimony Established That the Fire Ignited the Combustible OSB*

As noted above, the risks associated with a "false chimney" are well-known and are warned against in the product manual, the NFPA and the applicable building codes. The reason for this risk, as testified to by Mr. Chaney and Mr. Carper, is that combustible materials ignite at temperatures vastly lower that those produced by a wood burning fire. Mr. Chaney testified, based on applicable MSDS sheets, that the ignition temperature for OSB is 400 degrees Fahrenheit,[84] while the temperature of a burning wood fire is 1880 degrees Fahrenheit.[85]

Mr. Carper also testified regarding these issues. Mr. Carper testified that the fireplace was tested and certified by Underwriters Laboratory, meaning that it had been tested for safety concerns, such as the required combustible setback of 8

---

[83] RR7, page 136, line 9 – line 18.
[84] RR6, page 203, line 23 – page 204, line 8.
[85] Mr. Carper also echoed this figure, citing to the table in NFPA 921 regarding temperatures associated with a wood burning fire. Mr. Carper also reviewed the MSDS information for OSB materials. RR6, page 53, line 2 – line 11. This information was further substantiated by data published by the United States Consumer Product Safety Commission. RR6, page 56, line 5 – line 57, line 6.

inches.[86] Mr. Carper also testified that the NFPA identifies the temperature of a wood fire as 1880 degrees Fahrenheit.[87] Mr. Carper testified that the temperature differential was important, because it would cause the OSB to auto ignite, an occurrence which happens when the temperature surrounding the OSB reaches a certain level.[88] Mr. Carper also referred to the scientific studies of Vytenis Babrauskas, specifically The Ignition Handbook, which detailed the temperatures at which combustible material would auto-ignite.[89] For this reason, the risks associated with certain combustible materials in proximity to a firebox are well-known and documented in NFPA 921.[90] Additional testimony on this point came from the fireplace manufacturer representative, Mr. Joe Stephens, who testified that he informed Appellant about the need for clearance for combustible materials[91] and that it was his routine practice to leave the installation manual which contained the warnings noted above at the job site.[92]

At trial, Appellant vigorously cross-examined Mr. Chaney and Mr. Carper about these issues. Specifically, Appellant argued (and continues to argue) that Mr. Chaney should have reconstructed the fireplace in order to test whether or not the OSB would catch fire. Mr. Chaney testified that such testing was not required

---

[86] RR5, page 166, line 17 – page 168, line 6.
[87] RR6, page 50, line 19 – page 52, line 16.
[88] RR6, page 53, line 12 – page 54, line 8.
[89] RR6, page 54, line 9 – page 56, line 4.
[90] RR6, page 58, line 14 – 16.
[91] RR8, page 60, line 1 – 22.
[92] RR8, page 67, line 22 – page 68, line 17.

by NFPA 921.[93] Texas law also does not hold that testing is always required to support an expert's opinion. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 642 (Tex.2009). Further, Mr. Chaney pointed out that such testing would not be meaningful unless replicated many times.[94] However, such testing had been done by the fireplace manufacturer, Mr. Babrauskas and the NFPA, which is what generated the 8 inch clearance requirement. The following exchange occurred during cross-examination:

Q. Is one of the factors here, the reason you didn't do this testing, is that you didn't want to know the result?

A. No.

Q. Did you have any concern that this test would not—if you had done it, this test would not have supported your hypothesis in this case?

A. No.

Q. You're—you're just confident about that?

A. I know about tests that have been done on a similar fireplace that started a fire that he exposed wood right at the opening and, hence, the label was developed and the instructions in the manual about keeping wood up above eight inches from the opening of the fireplace.

*****

---

[93] RR6, page 173, lines 12 – 16. Appellant's expert, Mr. Nichols confirmed that NFPA 921 does not require testing as well. RR10, page 127, line 12 – page 128, line 24.

[94] RR7, page 20, line 13 – page 23, line 6. Appellant argues that testing gives better data than yielded by the Allbaughs' experts. Assuming that an accurate test could be performed, the presence of a "superior" test does not invalidate other methods.

Q.    Yeah, if you had done that, you're absolutely certain that the results would have supported your reverse cognitive analysis?

A.    If you absolutely replicated the fireplace at the Allbaughs' house on December 24, 2008, you get the same fire. That's my opinion.

Q.    Okay. As—any you have that to a science—in your opinion, is that a scientific certitude?

A.    I think it—it is a scientific probability. That is exactly what would have happened.[95]

Simply put, Appellant tried to make this argument before the trial court and the jury. The argument failed then and fails now. More than adequate testimony regarding the existence of a false chimney and the mechanism for the fire was presented to the jury.

## *Conclusion*

Despite Appellant's claim, the *Gharda* case does not impact the issues present here, as there are many significant dissimilarities:

| GHARDA | ALLBAUGH |
|---|---|
| Experts hypothesized that human error in the manufacturing process possibly led to the presence of excess EDC. | Positive testimony demonstrated that Appellant improperly installed the fireplace and failed to seal gaps with fire-resistant mortar, thereby creating the false chimney. |
| Experts hypothesized that excess EDC could cause an exothermic reaction. | False chimneys are a known hazard in fireplace construction and are specifically warned against by the |

---

[95]    RR7, page 24, line 23 – page 27, line 5.

| | installation manuals, as well as various building codes and the NFPA. |
|---|---|
| Experts hypothesized that EDC could cause an exothermic reaction. | Published data from nationally relied upon sources showed that combustible materials will auto-ignite at the temperatures generated by a wood fire. |
| The area in which the fire originated was unknown. | All experts agreed the fire began in the interstitial space above the firebox where the improperly place combustible OSB was located. |

Not only does the *Gharda* case significantly differ from the facts present herein, but Appellant's challenge to the methodology used by the Allbaughs' experts would, if accepted, undercut the examination process used and approved by fire experts every day. Moreover, such acceptance could have far reaching implications, as investigations done using the NFPA 921 methodology are used in many proceedings, including criminal trials.

Appellant's point of error should be overruled and the judgment of the trial court and jury should be upheld.

Respectfully submitted,

**COZEN O'CONNOR**


BY:  */s/ Gregory S. Hudson*
　　　Gregory S. Hudson
　　　State Bar No. 00790929
　　　COZEN O'CONNOR
　　　One Houston Center
　　　1221 McKinney Street, Suite 2900
　　　Houston, Texas 77010
　　　Telephone:  (832) 214-3900
　　　Facsimile:  (832) 214-3905
　　　Email:　　ghudson@cozen.com

　　　Suzanne C. Radcliff
　　　Texas Bar No. 24014420
　　　COZEN O'CONNOR
　　　1717 Main Street, Suite 3400
　　　Dallas, TX 75201
　　　Telephone:  (214) 462-3000
　　　Facsimile:  (214) 462-3299
　　　Email:　　acook@cozen.com
　　　Email:　　scradcliff@cozen.com


　　　**ATTORNEYS FOR APPELLEES**

29

## CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of Texas Rule of Appellate Procedure 9.4(e) because it has been prepared in a conventional typeface no smaller that 14-point for text and 12-point for footnotes.   This document contains 7663 words.

By:   */s/ Gregory S. Hudson*
Texas State Bar No. 00790929

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that a true and correct copy of this document was served on the parties via Electronic Court Filing on this 30th day of June, 2015.

David E. Chamberlain
Tim Poteet
Erin Westendorf-Boyd
Chamberlain McHaney
301 Congress Avenue, 21st Floor
Austin, Texas 78701
Telephone:   (512) 474-9124
Facsimile:   (512) 474-8582
Emails:       dchamberlain@chmc-law.com
              tpoteet@chmc-law.com
              ewestendorf@chmc-law. com

**Attorneys for Defendant Zbranek Custom Homes, Ltd.**

By:   */s/ Gregory S. Hudson*
      Texas State Bar No. 00790929

LEGAL\23314524\3

31